## UNITED STATES DISTRICT COURT
## DISTRICT OF NORTHERN OHIO

**NICHOLAS TIMMONS**, individually and on behalf of all others similarly situated,

Plaintiff,

v.

**INTELLIHARTX, LLC**,

Defendant.

Civil Action No.:

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Christopher Nicholas Timmons ("Plaintiff"), individually on behalf of himself and all others similarly situated, alleges the following against Intellihartx, LLC ("ITx" or "Defendant"). The following allegations are based upon Plaintiff's personal knowledge with respect to himself and his own acts, and following his investigation and the investigation of his counsel, upon information and belief as to all other matters.

### I.     INTRODUCTION

1.     Plaintiff and Class Members bring this class action against Defendant ITx for its failure to properly secure and safeguard Plaintiff's and similarly situated individuals' personally identifiable information ("PII") and protected health information ("PHI"), including names, addresses, dates of birth, Social Security numbers, medical billing and insurance information, and medical information such as diagnoses and medication.

2.     ITx is a healthcare revenue cycle company focused exclusively on healthcare clients including hospitals and physicians' groups. ITx maintains the PII and PHI of its clients' patients.

1

3.     This class action is brought on behalf of all citizens of all states in the United States who are the victims of a targeted cyberattack that occurred on or before February 2, 2023.

4.     On or before February 2, 2023, Defendant allowed a cyber attacker to access and obtain the PII and PHI of Plaintiff and Class Members.  Through this failure, Defendant publicly exposed the highly-sensitive information of over 480,000 patients.

5.     Despite that ITx became aware of the Data Breach by February 2, 2023, at the latest, it failed to notify Plaintiff and the Class Members within 60 days as required by law.  Notably, Defendant failed to notify Plaintiff and Class Members of the Data Breach for more than four months from its discovery of the same.  ITx's Notice was untimely and woefully deficient, failing to provide basic details concerning the Data Breach, including, but not limited to, how unauthorized parties accessed the computer server, whether the information was encrypted or otherwise protected, how and when ITx learned of the Data Breach, whether the breach was a system-wide breach, whether servers storing information were accessed, and how many people were affected by the Data Breach.

6.     Defendant knowingly collected patient PII and PHI (collectively, "Private Information") in confidence, and has a resulting duty to secure, maintain, protect, and safeguard that Private Information against unauthorized access and disclosure through reasonable and adequate security measures.

7.     PHI is considered "the most confidential and valuable type of [PII] . . . irrevocable once breached."[1]

---

[1] Junyuan Ke, et al., *My Data or My Health? Heterogenous Patient Responses to Healthcare Data Breach*, SSRN (Feb. 10, 2022), http://dx.doi.org/10.2139/ssrn.4029103.   Under the Health Insurance Portability and Accountability Act, 42 U.S.C. §§1320d, et seq. ("HIPAA"), PHI is considered to be individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered

8.     As a result of the Data Breach, Plaintiff and Class Members suffered ascertainable losses, including, but not limited to, a diminution in the value of their private and confidential information, the loss of the benefit of their contractual bargain with Defendant, out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

9.     Plaintiff and Class Members entrusted their Private Information to Defendant, their officials, and agents.  That Private Information was subsequently compromised, unlawfully accessed, and stolen due to the Data Breach.

10.     Plaintiff brings this class action lawsuit on behalf of themselves and all others similarly situated to address Defendant's inadequate safeguarding of Plaintiff's and Class Members' Private Information, for failing to provide timely and adequate notice to Plaintiff and other Class Members of the unauthorized access to their Private Information by a cyber attacker, and for failing to provide timely and adequate notice of precisely what information was accessed and stolen.

11.     Defendant breached its duties to Plaintiff and Class Members by maintaining Plaintiff's and the Class Members' Private Information in a negligent and reckless manner.

12.     Upon information and belief, the means of the Data Breach and potential risk for improper disclosure of Plaintiff's and Class Members' Private Information were known and

---

entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations.  45 C.F.R. §160.103.  Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information.  Summary of the HIPAA Privacy Rule, U.S. DEP'T OF HEALTH & HUMAN SERS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html  (last  visited July 25, 2023).

foreseeable to Defendant. Thus, Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left the Private Information in a dangerous and vulnerable condition.

13. Defendant, and its employees, failed to properly monitor the computer network and systems housing the Private Information.

14. Had Defendant properly monitored its property, it would have discovered the intrusion sooner or been able to wholly prevent it.

15. Exacerbating an already devastating privacy intrusion, Plaintiff's and Class Members' identities are now at a heightened risk of exposure because of Defendant's negligent conduct since the Private Information that Defendant collected and stored is now in the hands of data thieves.

16. Armed with the Private Information accessed in the Data Breach, data thieves have data from Defendant to commit a variety of crimes, including credit/debit card fraud, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' health information to target other phishing and hacking intrusions based upon their individual health needs, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

17. As a direct result of the Data Breach, Plaintiff and Class Members have suffered fraud and will continue to be exposed to a heightened and imminent risk of fraud and identity theft, potentially for the rest of their lives. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

18. Plaintiff and Class Members may also incur out-of-pocket costs for purchasing credit monitoring services, credit freezes, credit reports, and other protective measures to deter and detect identity theft.

19. As a direct and proximate result of the Data Breach and subsequent exposure of their Private Information, Plaintiff and Class Members have suffered, and will continue to suffer damages and economic losses in the form of lost time needed to take appropriate measures to avoid unauthorized and fraudulent charges, putting alerts on their credit files, and dealing with spam phone calls, letters, and emails received as a result of the Data Breach.

20. Plaintiff and Class Members have suffered, and will continue to suffer, an invasion of their property interest in their own PII and PHI such that they are entitled to damages from Defendant for unauthorized access to, theft of, and misuse of their Private Information. These harms are ongoing, and Plaintiff and Class Members will suffer from future damages associated with the unauthorized use and misuse of their Private Information as thieves will continue to use the information to obtain money and credit in their names for several years.

21. Plaintiff seeks to remedy these harms on behalf of all similarly situated individuals whose Private Information was accessed and/or compromised from Defendant's networks during the Data Breach.

22. Accordingly, Plaintiff brings this action, on behalf of themselves and all others similarly situated, against Defendant seeking redress for its unlawful conduct asserting claims for (1) negligence, (2) negligence *per se*, (3) breach of implied contract, (4) breach of a third-party beneficiary contract, (5) unjust enrichment, and (6) breach of confidence.

## II.     PARTIES

### A.  Plaintiff

23.     Plaintiff Nicholas Timmons ("Plaintiff Timmons") is a resident of Cape Girardeau, MO and a citizen of Missouri.  Mr. Timmons learned of the ITx Data Breach through a letter sent by ITx to him via mail on June 9, 2023.

### B.  Defendant

24.     Defendant Intellihartx is a limited liability company organized under the laws of Ohio with its principal place of business in Findlay, Ohio.  Intellihartx is a healthcare revenue cycle company focused exclusively on healthcare clients including hospitals and physicians' groups.

## III.     JURISDICTION AND VENUE

25.     This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2).  The amount in controversy exceeds $5 million, exclusive of interest and costs, consists of putative class membership of greater than 100 members, and is a class action in which some of the members of the Class, including Plaintiff, are citizens of states different than that of Defendant.

26.     This Court has personal jurisdiction over Defendant Intellihartx because its principal place of business is in Ohio.

27.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendant Inellihartx resides in this District, a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in, was directed to, and/or emanated from this District, and Defendant conducts substantial business in this District.

## IV.     STATEMENT OF FACTS

### A. Defendant Intellihartx's Business

28.     Defendant Intellihartx was founded in 2012 as a healthcare revenue cycle company focused exclusively on healthcare clients including hospitals and physicians' groups.  Revenue cycle management is the process of using billing software to track patient care episodes through each stage of interaction between the healthcare service provider and the patient—from registration and appointment scheduling to the final payment of a balance.

29.     ITx claims to increase revenue for its clients by providing debt-payment services, including self-pay concierge services and patient open balances services.  ITx further explains who it works to serve on its website, stating, "We serve Patients, not Debtors."[2]

30.     ITx utilizes Fortra as its secure file transfer protocol provider.

### B. The Collection of Plaintiff's and Class Members' Private Information is Central to Defendant's Business

31.     In order for ITx to offer revenue cycle management services to its healthcare provider clients, the healthcare provider clients were required to transfer possession of patient PII and PHI to ITx.

32.     Through the possession and utilization of Plaintiff's and Class Members' Private Information, ITx assumed duties owed to Plaintiff and Class Members regarding their Private Information.  Therefore, ITx knew or should have known that it was responsible for safeguarding Plaintiff's and Class Members' Private Information from unauthorized access and criminal misuse.

---

[2] https://www.itxcompanies.com/what-we-do (last visited on July 25, 2023).

33.     Plaintiff and Class Members relied on Defendant to keep their Private Information secure and safeguarded for authorized purposes.  Defendant owed a duty to Plaintiff to secure their Private Information as such, and ultimately breached that duty.

### C. The Data Breach

34.     On or around February 2, 2023, cybersecurity journalist and expert Brian Krebs reported that Fortra had alerted customers about a "zero-day remote code injection exploit."[3]  ITx uses Fortra as its secure file transfer protocol provider—specifically utilizing, at least in part, Fortra's GoAnywhere MFT secure file transfer platform.  Krebs noted that Fortra had temporarily implemented a service outage in response, and posted the full text of the advisory Fortra sent out to its customer.  Remote code injection is a method attackers utilize to execute malicious code over a network.  Disclosure of data stored in a platform or on a server is one of the threats of a remote code exploit attack.

35.     On or around February 10, 2023, the Russia-linked ransomware group CL0P claimed responsibility for the GoAnywhere attacks.

36.     Over four months after the attack, on June 6, 2023 and June 9, 2023 ITx notified Plaintiff and Class Members that ITx was one of the entities impacted.  In the notice, ITx claimed that it conducted a series of internal investigations between March and May 2023.  ITx further stated that it first notified the healthcare provider clients of the Data Breach on April 11, 2023.

37.     ITx further notified Plaintiff and Class Members their PII and PHI had been exposed, and therefore compromised, in the attack.

---

[3] *See* @BriabKrebs, Mastodon, https://infosec.exchange/@briankrebs/109795710941843934.

38.     It took Defendant over four months after the Data Breach to inform Plaintiff and Class Members of the Data Breach, resulting in Plaintiff and Class Members suffering harm they otherwise may have been able to avoid had Defendant announced the Data Breach sooner.

39.     Defendant ITx's Notice was untimely and woefully deficient, failing to provide basic details concerning the Data Breach, including, but not limited to, how unauthorized parties accessed Defendant Fortra's computer server, whether the information was encrypted or otherwise protected, how and when ITx learned of the Data Breach, whether the breach was a system-wide breach, whether servers storing information were accessed, and how many people were affected by the Data Breach.

40.     Given the intentional and criminal nature of the cybersecurity attack, Plaintiff's and Class Members' Private Information is now for sale to criminals on the dark web; meaning unauthorized parties have accessed and viewed Plaintiff's and Class Members' unencrypted, unredacted Private Information, including name, date of birth, billing and insurance information, patient referral information, relevant medical records, diagnosis information, Social Security numbers, and more.

### D.     *Plaintiff's Experiences Following the Data Breach*

**Nicholas Timmons**

41.     Plaintiff Timmons has been a regular patient at SoutheastHealth for about three years.

42.     On multiple occasions, Plaintiff Timmons has been required to provide his Private Information to Defendant, directly or indirectly, as a condition of his treatment.

43.     Plaintiff Timmons received a Data Breach Notice informing him of the Data Breach in June 2023.

9

44.     Thereafter, Plaintiff Timmons spent time taking action to mitigate the impact of the Data Breach after he received the Data Breach Notice.  This effort included checking his bank accounts and other online accounts, inquiring as to the offered one-year credit monitoring subscription, examining his credit score, and researching the potential impact of the Data Breach, all as a result of his Private Information being exposed in the Data Breach.  Plaintiff Timmons intends to spend additional time and effort taking steps to protect his Private Information in the future.  Because of the Data Breach, Plaintiff Timmons spent valuable time he otherwise would have spent on other obligations.

45.     Moreover, Plaintiff Timmons spent this time at Defendant ITx's direction.  In the Data Breach Notice Plaintiff Timmons received, ITx encouraged Plaintiff to spend time mitigating his losses by "reviewing your account statements and monitoring your free credit reports for suspicious activity" and "to remain vigilant against incidents of identity theft and fraud."

46.     Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Timmons faces, ITx offered him a one-year membership to credit monitoring services. When Mr. Timmons called Experian Identity Works about this service, a representative for the company made clear that if he were to accept the credit monitoring services, it would be in exchange for "buying his silence."  Plaintiff Timmons chose not to enroll in the offered credit monitoring at that time.  Further, this offer is inadequate because data breach victims commonly face many years of ongoing identity theft.

47.     As a result of the Data Breach, Plaintiff Timmons has suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach.  This is time Mr. Timmons

otherwise would have spent performing other activities, such as his job and/or leisurely activities for the enjoyment of life.

48. In addition, Plaintiff Labbee has suffered and will continue to suffer emotional distress as a result of the Data Breach, and has increased concerns for the loss of his privacy and the release of his protected health information, which he would not have suffered had Defendant implemented the necessary and proper safeguards to protect Plaintiff's and Class Members' Private Information from theft.

49. The Private Information that was accessed in the Data Breach was the kind of sensitive information that can be used to commit fraud and identity theft. It was reasonable and foreseeable that Plaintiff Timmons would take, and continue to take, necessary measures to protect his Private Information.

50. Plaintiff Timmons has a continuing interest in ensuring that his Private Information, which, upon information and belief, remain in Defendant's possession, is protected and safeguarded from further and future breaches.

51. Plaintiff Timmons suffered actual injury in the form of damages to and diminution of the value of Private Information—a form of intangible property that Plaintiff entrusted to Defendant for the purpose of receiving medical services, which was compromised in, and as a result, of the Data Breach.

52. Plaintiff Timmons has also suffered actual injury in the form of:

    i. Lost time by having to deal with all the consequences of the Data Breach, including reviewing and monitoring his bank accounts and other online accounts and researching the impacts of the Data Breach;

ii.    Dealing with a wave of scammer telephone calls—often at a frequency of up to eight calls per day;

iii.    Suffering a drop in his credit score; and

iv.    Handling a wave of fraudulent loan and credit pre-approval mail, all as a result of his Private Information being exposed in the Data Breach.  This is time Plaintiff Colby otherwise would have spent performing other activities or leisurely events for the enjoyment of life.

53.    As a result of the Data Breach, Plaintiff Timmons will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

54.    As a result of the Data Breach, Plaintiff has suffered emotional distress as a result of the release of her protected health information which he expected Defendant to protect from disclosure, including anxiety, concern, and unease about unauthorized parties viewing, and potentially using his Private Information.

55.    As a result of the Data Breach, Plaintiff Timmons will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

### E.    *The Healthcare Sector Is Particularly Susceptible to Cyberattacks*

58.    Defendant was or should have been on notice that the Federal Bureau of Investigation ("FBI") has been concerned about data security in the healthcare industry.  In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them.  The warning stated that "'[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of

12

obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII).'"[4]

59.     The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack.  Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[5]

60.     The number of U.S. data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[6]  In 2022, 1,802 data compromises were reported that impacted over 422 million victims—marking a 42% increase in the number of victims impacted since 2021.[7]  That upward trend continues.

---

[4] Jim Finkle, *FBI warns healthcare firms that they are targeted by hackers*, REUTERS (Aug. 20, 2014),     https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[5] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N     (Oct.     4,     2019),     https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (emphasis omitted).

[6] Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center     and     CyberScout,     CISION     PR     NEWSWIRE     (Jan.     19,     2017), https://www.prnewswire.com/news-releases/data-breaches-increase-40-percent-in-2016-finds-new-report-from-identity-theft-resource-center-and-cyberscout-300393208.html.

[7]     2022     Annual     Data     Breach     Report,     IDENTITY     THEFT     RES.     CTR., https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited July 25, 2023).

61.    The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[8]   Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[9]  Almost 50% of the victims lost their healthcare coverage as a result of the incident, while nearly thirty percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[10]

62.    Healthcare related data breaches have continued to rapidly increase.  According to the 2019 HIMSS Cybersecurity Survey, 82% of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[11]

> Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information (PII) for thousands of patients at any given time.  From social security and insurance policies to next of kin and credit

---

[8]    2018  End-of-Year  Data  Breach  Report,  IDENTITY  THEFT  RES.  CTR., https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINALWEB-V2-2.pdf (last visited July 25, 2022).

[9] Elinor Mills, Study: Medical identity theft is costly for victims, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

[10] *Id.*

[11]    2019  HIMSS  Cybersecurity  Survey,  HIMSS, https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf (last visited July 25, 2023).

cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers.[12]

63.     As entities both contracting with healthcare service providers and handling, storing, and safeguarding patients' PHI, Defendant knew, or reasonably should have known, the importance of safeguarding patients' Private Information entrusted to it, and of the foreseeable consequences if its data security systems were breached.  Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### i.      The Value of Private Information and the Effects of Unauthorized Disclosure

64.     At all relevant times, Defendant was well aware that the Private Information it collects from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

65.     Private Information is a valuable commodity to cyber attackers.  As the Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[13]  Indeed, a robust "cyber black market" exists in which criminals openly post stolen Private Information on multiple underground websites, commonly referred to as the dark web.

---

[12]     Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, CHIEF HEALTHCARE EXEC. (Apr. 4, 2019), https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks.

[13]     *What to Know About Identify Theft*, Fed. Trade Comm'n, https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited July 25, 2023).

66.    While credit card information and associated PII can sell for as little as $1-$2 on the black market, PHI can sell for as much as $363.[14]

67.    PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements.  It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

68.    Medical identify theft can result in inaccuracies in medical records and costly false claims.  It can also have life-threatening consequences.  If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment.  "'Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery,'" reported Pam Dixon, executive director of World Privacy Forum.  "'Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities.'"[15]

69.    Similarly, the FBI Cyber Division, in an April 8, 2014 Private Industry Notification, advised:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number.  EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance

---

[14]    *Data Breaches: In the Healthcare Sector,* Ctr. for Internet Sec., https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited July 25, 2023).

[15] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, Kaiser Health News (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/.

identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.[16]

70.     The ramifications of Defendant's failures to keep Plaintiff's and Class Members' Private Information secure are long lasting and severe.  Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.  Fraudulent activity might not show up for six to 12 months or even longer.

71.     Further, criminals often trade stolen Private Information on the "cyber black-market" for years following a breach.  Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

72.     Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened.[17]  This gives thieves ample time to seek multiple treatments under the victim's name.  And 40% of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[18]

73.     As entities serving healthcare service providers, Defendant knew, or reasonably should have known, the importance of safeguarding Plaintiff's and Class Members' Private Information entrusted to it, and of the foreseeable consequences if its data security systems were

---

[16] *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI CYBER DIV. (Apr. 8, 2014), https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf.

[17] *See Medical ID Theft Checklist*, IdentityForce https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last visited July 25, 2023).

[18] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages")*, Experian (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

breached.  This includes the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.  Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### ii.  *Defendant's Conduct Violates HIPAA*

74.    HIPAA requires covered entities to protect against reasonably anticipated threats to the security of PHI.  Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI.  Safeguards must include physical, technical, and administrative components.[19]

75.    Defendant is a covered entities under HIPAA and are therefore required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

76.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§1301, *et seq*.  These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Private Information like the data Defendant failed to safeguard.  The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

---

[19] *What is Considered Protected Health Information Under HIPAA?*, HIPAA J. (Jan. 1, 2023), https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/.

77.    The HIPAA Breach Notification Rule, 45 CFR §§164.400-414, also required Defendant to provide notice of the breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of a breach."[20]

78.    Based on information and belief, Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations and industry standards.  Defendant's security failures include, but are not limited to, the following:

  a.    Failing to ensure the confidentiality and integrity of electronic protected health information that Defendant receive, maintain, and transmit in violation of 45 C.F.R. §164.306(a)(1);

  b.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

  c.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

  d.    Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

---

[20]    *Breach Notification Rule*, U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited July 25, 2023) (emphasis added).

e.   Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

f.   Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

g.   Failing to ensure compliance with HIPAA security standard rules by its workforce in violation of 45 C.F.R. §164.306(a)(94);

h.   Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, *et seq.*;

i.   Failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out its functions and to maintain security of protected health information in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

j.   Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

*iii.*   ***Defendant Failed to Comply with FTC Guidelines***

79.   Defendant was also prohibited by the Federal Trade Commission Act ("FTCA") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce."

The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTCA.[21]

80.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices.  According to the FTC, the need for data security should be factored into all business decision-making.[22]

81.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[23]  The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand its network's vulnerabilities; and implement policies to correct any security problems.

82.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

---

[21] *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

[22] *Start With Security: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited July 25, 2023).

[23] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited July 25, 2023).

83.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. §45.  Orders resulting from these actions further clarify the measures businesses must take to meet its data security obligations.

84.    Defendant failed to properly implement basic data security practices.  Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. §45.

85.    Defendant was fully aware of its obligations to protect the Private Information of Plaintiff and Class Members because of its positions as providers whose businesses center on the collection, storage, and safeguarding of Private Information.  Defendant was also aware of the significant repercussions that would result from its failure to make good on those obligations.

### iv.    Cyber Criminals Have and Will Continue to Use Plaintiff's and Class Members' PII and PHI for Nefarious Purposes

86.    Plaintiff's and Class Members' highly sensitive PII and PHI is of great value to cybercriminals, and the data stolen in the Data Breach can be used in a variety of ways for criminals to exploit Plaintiff and the Class Members and to profit off their misfortune and stolen information. The cybercriminals' motives for the Data Breach were purely nefarious and malicious in nature: their one goal was to access Defendant's systems in order to obtain valuable PII and PHI to sell on the dark web.

87.     Every year, identity theft causes tens of billions of dollars of losses to victims in the United States.[24]  For example, with the PII stolen in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[25]  These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

88.     PII is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.

89.     These risks are both certainly impending and substantial. As the FTC has reported, if cyber attackers get access to personally identifiable information, they will use it.[26]

90.     Cyber attackers may not use the information right away.  According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.  As a result, studies

---

[24]     *Facts + Statistics: Identity Theft and Cybercrime*, INS. INFO. INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited on July 25, 2023) (discussing Javelin Strategy & Research's report *2018 Identity Fraud: Fraud Enters a New Era of Complexity*).

[25]     *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, CREDIT.COM (Nov. 2, 2017), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[26]     Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017),     https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[27]

91.     If cyber criminals manage to access financial information, health insurance information, and other personally sensitive data, as is the case with this Data Breach, there is no limit to the amount of fraud to which Defendant may have exposed the Plaintiff and Class Members.

> **_v._      _Plaintiff and Class Members Suffered Damages_**

92.     The ramifications of Defendant's failures to keep Plaintiff's and Class Members' Private Information secure are long lasting and severe.  Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.  Consumer victims of data breaches are more likely to become victims of identity fraud.[28]

93.     In addition to their obligations under state laws and regulations, Defendant owed a common law duty to Plaintiff and Class Members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

94.     Defendant further owed and breached its duties to Plaintiff and Class Members to implement processes and specifications that would detect a breach of its security systems in a timely manner and to timely act upon warnings and alerts, including those generated by its own security systems.

---

[27] Stolen Laptops Lead to Important HIPAA Settlements, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Apr. 22, 2014), https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

[28] *2014 LexisNexis True Cost of Fraud Study*, LEXISNEXIS (Aug. 2014), https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf.

95.     As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, cyber attackers were able to access, acquire, view, publicize, and/or otherwise cause the identity theft and misuse to Plaintiff's and Class Members' Private Information as detailed above, and Plaintiff are now at a heightened risk of identity theft and fraud.

96.     The risks associated with identity theft are serious.  While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record.  Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports.  In rare cases, they may even be arrested for crimes they did not commit.

97.     Other risks of identity theft include loans opened in the name of the victim, medical services billed in their name, utility bills opened in their name, tax return fraud, and credit card fraud.

98.     Plaintiff and Class Members did not receive the full benefit of the bargain for received healthcare and other services.  As a result, Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value of the healthcare services with data security protection they paid for and the healthcare they received without the data security protection.

99.     As a result of the Data Breach, Plaintiff's and Class Members' Private Information has diminished in value.

100.    The Private Information belonging to Plaintiff and Class Members is private, private in nature, and was left inadequately protected by Defendant who did not obtain Plaintiff's

or Class Members' consent to disclose such Private Information to any other person as required by applicable law and industry standards.

101.    The Data Breach was a direct and proximate result of Defendant's failure to: (a) properly safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

102.    Defendant had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite their obligation to protect patient data.

103.    Had Defendant remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusions into their systems and, ultimately, the theft of Plaintiff's and Class Members' Private Information.

104.    As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

105.    The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more

resolving problems" and that "[r]esolving the problems caused by identity theft [could] take more than a year for some victims."[29]

106.     Defendant's failures to adequately protect Plaintiff's and Class Members' Private Information has resulted in Plaintiff and Class Members having to undertake these tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money.  Rather than assist those affected by the Data Breach, Defendant is putting the burden on Plaintiff and Class Members to discover possible fraudulent activity and identity theft.

107.     As a result of Defendant's failures to prevent the Data Breach, Plaintiff and Class Members have suffered, will suffer, and are at increased risk of suffering:

    a.  The compromise, publication, theft and/or unauthorized use of their Private Information;

    b.  Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

    c.  Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

    d.  The continued risk to their Private Information, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fail to undertake appropriate measures to protect the Private Information in their possession;

    e.  Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and

    f.  Anxiety and distress resulting from fear of misuse of their medical information.

---

[29] Erika Harrell, & Lynn Langton, *Victims of Identity Theft, 2012*, U.S. DEP'T OF JUST., OFF. OF JUST. PROGRAMS BUREAU OF JUST. STATS. (Dec. 2013), https://www.bjs.gov/content/pub/pdf/vit12.pdf.

124.    In addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

### vi.    Defendant's Delay in Identifying & Reporting the Breach Caused Additional Harm

108.    It is axiomatic that:

> The quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act.[30]

109.    Indeed, once a data breach has occurred:

> [o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit card bills and suspicious emails.  It can prompt them to change passwords and freeze credit reports.  And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers.
>
> "If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves. . . . "[31]

110.    Although their Private Information was improperly exposed on, about, or before February 2, 2023, Plaintiff and Class Members were not notified of the Data Breach until June of 2023, depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.

---

[30] *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, BUSINESS WIRE (Feb. 1, 2017), https://www.businesswire.com/news/home/20170201005166/en/Identity-Fraud-Hits-Record-High-15.4-Million.

[31] Allen St. John, *The Data Breach Next Door*, CONSUMER REPORTS, (Jan. 31, 2019), https://www.consumerreports.org/data-theft/the-data-breach-next-door/.

111.    As a result of Defendant's delay in detecting and notifying patients of the Data Breach, the risk of fraud for Plaintiff and Class Members has been driven even higher.

## 56.    CLASS ALLEGATIONS

112.    Plaintiff brings this class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

113.    The Nationwide Class that Plaintiff seek to represent is defined as follows:

**Nationwide Class: All individuals whose personally identifiable information and protected health information was compromised in the Data Breach announced by Defendant in June 2023.**

114.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, current or former employees, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as its immediate family members.

115.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

116.    Numerosity, Fed. R. Civ. P. 23(a)(1): The Class is so numerous that joinder of all members is impracticable.   Defendant has identified nearly 500,000 people whose Private Information may have been improperly accessed and compromised in the Data Breach.

117. <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

i. Whether and when Defendant actually learned of the Data Breach and whether its response was adequate;

ii. Whether Defendant owed a duty to the Class to exercise due care in collecting, storing, safeguarding and/or obtaining Class Members' Private Information;

iii. Whether Defendant breached that duty;

iv. Whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of storing Plaintiff and Class Members' Private Information;

v. Whether Defendant acted negligently in connection with the monitoring and/or protecting of Plaintiff's and Class Members' Private Information;

vi. Whether Defendant knew or should have known that it did not employ reasonable measures to keep Plaintiff's and Class Members' Private Information secure and prevent loss or misuse of that Private Information;

vii. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

viii. Whether Defendant caused Plaintiff's and Class Members' damages;

ix. Whether Defendant violated the law by failing to promptly notify Class Members that their Private Information had been compromised;

x. Whether Plaintiff and the other Class Members are entitled to actual damages, extended credit monitoring, and other monetary relief;

xi.    Whether Defendant violated common law and statutory claims alleged herein.

118.    <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members, because all had their Private Information compromised as a result of the Data Breach, due to Defendant's misfeasance.

119.    <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class and making final injunctive relief appropriate with respect to the Class as a whole.  Defendant's policies challenged herein apply to and affect the Class uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

120.    <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class.  Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members.  Plaintiff have retained counsel experienced in complex consumer class action litigation, and Plaintiff intend to prosecute this action vigorously.

121.    <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved.  Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary

duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant.  Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

122.    The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since Defendant would be able to exploit and overwhelm the limited resources of the Class with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

123.    The litigation of the claims brought herein is manageable.  Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

124.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

125.    Unless a Class-wide injunction is issued, Plaintiff and Class Members remain at risk that Defendant will continue to fail to properly secure the Private Information of Plaintiff and

Class Members resulting in another data breach, continue to refuse to provide proper notification to Class Members regarding the Data Breach, and continue to act unlawfully as set forth in this Class Action Complaint.

126.    Defendant acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

127.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to the following:

      a.  Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, using, and safeguarding their Private Information;

      b.  Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

      c.  Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

      d.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

e.  Whether Class Members are entitled to actual damages, additional credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Nationwide Class)**

128.  Plaintiff repeats and realleges all allegations set forth above as if they were fully set forth herein.

129.  Plaintiff and Class Members were required to submit their Private Information in order to receive healthcare services.

130.  Defendant knew, or should have known, of the risks inherent in collecting and storing the Private Information of Plaintiff and Class Members.

131.  As described above, Defendant owed duties of care to Plaintiff and Class Members whose Private Information had been entrusted with Defendant.

132.  Defendant breached its duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

133.  Defendant acted with wanton disregard for the security of Plaintiff's and Class Members' Private Information.  Defendant knew or reasonably should have known that they had inadequate computer systems and data security practices to safeguard such information, and Defendant knew or reasonably should have known that data thieves were attempting to access databases containing PII and PHI, such as those of Defendant.

134.  A "special relationship" exists between Defendant and the Plaintiff and Class Members.  Defendant entered into a "special relationship" with Plaintiff and Class Members

because Defendant collected the Private Information of Plaintiff and the Class Members—information that Plaintiff and the Class Members were required to provide in order to receive healthcare services.

135.   But for Defendant's wrongful and negligent breaches of the duties owed to Plaintiff and the Class Members, Plaintiff and the Class Members would not have been injured.

136.   The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breaches of its duties.  Defendant knew or reasonably should have known it was failing to meet its duties, and that Defendant's breaches of such duties would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

137.   As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT II
### Negligence *Per Se*
### (On Behalf of Plaintiff and the Nationwide Class)

138.   Plaintiff repeats and realleges all allegations set forth above as if they were fully set forth herein.

139.   Pursuant to the FTCA (15 U.S.C. §45), Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

140.   Pursuant to HIPAA (42 U.S.C. §§1302d, *et seq*.), Defendant had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

141.   Defendant breached its duties to Plaintiff and Class Members under the FTCA (15 U.S.C. §45) and HIPAA (42 U.S.C. §§1302d, *et seq*.), by failing to provide fair, reasonable, or

adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

142.    Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

143.    But for Defendant's wrongful and negligent breaches of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

144.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breaches of its duty. Defendant knew or reasonably should have known that it was failing to meet its duties, and that Defendant's breaches would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

145.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

<u>COUNT III</u>
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Nationwide Class)**

146.    Plaintiff repeats and realleges all allegations set forth above as if they were fully set forth herein.

147.    Plaintiff and Class Members entered into an implied contract with Defendant when they obtained services from healthcare providers, in exchange for which they were required to provide their Private Information. The Private Information provided by Plaintiff and Class Members to Defendant was governed by and subject to Defendant's privacy duties and policies.

148.    Defendant agreed to safeguard and protect the Private Information of Plaintiff and Class Members and to timely and accurately notify Plaintiff and Class Members in the event that their Private Information was breached or otherwise compromised.

149.    Plaintiff and Class Members entered into the implied contracts with the reasonable expectation that Defendant's data security practices and policies were reasonable and consistent with industry standards.  Plaintiff and Class Members believed that Defendant would use part of the monies paid to Defendant under the implied contracts to fund adequate and reasonable data security practices.

150.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract or implied terms between Plaintiff and Class Members and Defendant.  The safeguarding of the Private Information of Plaintiff and Class Members and prompt and sufficient notification of a breach involving Private Information was critical to realize the intent of the parties.

151.    Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

152.    Defendant breached its implied contracts with Plaintiff and Class Members to protect Plaintiff's and Class Members' Private Information when they: (1) failed to have security protocols and measures in place to protect that information; (2) disclosed that information to unauthorized third parties; and (3) failed to provide timely and accurate notice that their Private Information was compromised as a result of the Data Breach.

153.    As a direct and proximate result of Defendant's breaches of implied contract, Plaintiff and Class Members have suffered damages.

**COUNT IV**
**Breach of Third-Party Beneficiary Contract**

**(On behalf of Plaintiff and the Nationwide Class)**

154.    Plaintiff repeats and realleges all allegations set forth above as if they were fully set forth herein.

155.    This Count is pleaded in the alternative to the breach of implied contract claim above (Count III).

156.    Upon information and belief, ITx entered into contracts with its healthcare-provider clients, including Plaintiff's healthcare providers, to provide revenue cycle management services—including data security practices, procedures, and protocols sufficient to safeguard the Private Information of Plaintiff and Class Members.

157.    These contracts were made for the benefit of Plaintiff and Class Members given the transfer of their Private Information to Defendant for storage, protection, and safeguarding was the objective of the contracting parties.  Therefore, Plaintiff and Class Members were direct and express beneficiaries of these contracts.

158.    Defendant knew that a breach of these contracts with its healthcare-provider clients would harm Plaintiff and Class Members.

159.    Defendant breached the contracts with its healthcare-provider clients when they failed to utilize adequate computer systems or data security practices to safeguard Plaintiff's and Class Members' Private Information.

160.    Plaintiff and Class Members were harmed by Defendant's breaches in failing to use reasonable security measures to safely store and protect Plaintiff's and Class Members' Private Information.

161.    Plaintiff and Class Members are therefore entitled to damages in an amount to be determined at trial.

## COUNT V
## Unjust Enrichment
### (On behalf of Plaintiff and the Nationwide Class)

162.    Plaintiff repeats and realleges all allegations set forth above as if they were fully set forth herein.

163.    This Count is pleaded in the alternative to the breach of implied contract claim above (Count III) and the breach of third-party beneficiary claim above (Count IV).

164.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with their Private Information—Private Information that has inherent value.  In exchange, Plaintiff and Class Members should have been entitled to Defendant's adequate storage and safeguarding of their Private Information.

165.    Defendant appreciated or had knowledge of the benefits conferred upon them by Plaintiff and Class Members.

166.    Defendant profited from Plaintiff's and Class Members' retained Private Information and used their Private Information for business purposes.

167.    Defendant failed to store and safeguard Plaintiff's and Class Members' Private Information.  Thus, Defendant did not fully compensate Plaintiff and Class Members for the value of their Private Information.

168.    As a result of Defendant's failures, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between the healthcare services with the reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and the inadequate healthcare services without reasonable data privacy and security practices and procedures that they received.

169.     Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed to implement—or adequately implement—the data privacy and security practices and procedures that Plaintiff and Class Members paid for and that were otherwise mandated by HIPAA regulations, federal, state and local laws, and industry standards.

170.     Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds received by Defendant.

171.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendant traceable to Plaintiff and Class Members.

## COUNT VI
### Breach of Confidence
### (On behalf of Plaintiff and the Nationwide Class)

172.     Plaintiff repeats and realleges all allegations set forth above as if they were fully set forth herein.

173.     At all times during Plaintiff's and the Class Members' interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiff's and the Class Members' Private Information that Plaintiff and the Class Members provided to Defendant.

174.     As alleged herein and above, Defendant's relationship with Plaintiff and the Class Members was governed by terms and expectations that Plaintiff's and the Class Members' Private Information would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

175.     Plaintiff and the Class Members provided their Private Information to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the Private Information to be disseminated to any unauthorized third parties.

40

176.     Plaintiff and the Class Members also provided their Private Information to Defendant with the explicit and implicit understandings that Defendant would take precautions to protect that Private Information from unauthorized disclosure.

177.     Defendant voluntarily received in confidence Plaintiff's and the Class Members' Private Information with the understanding that information would not be disclosed or disseminated to the public or any unauthorized third parties.

178.     Due to Defendant's failure to prevent and avoid the Data Breach from occurring, Plaintiff's and the Class Members' Private Information was disclosed and misappropriated to unauthorized third parties beyond Plaintiff's and the Class Members' confidence, and without their express permission.

179.     As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiff and the Class Members have suffered damages.

180.     But for Defendant's disclosure of Plaintiff's and the Class Members' Private Information in violation of the parties' understanding of confidence, their PII and PHI would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendant's Data Breach was the direct and legal cause of the theft of Plaintiff's and the Class Members' Private Information, as well as the resulting damages.

181.     The injury and harm Plaintiff and the Class Members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiff's and the Class Members' Private Information.  Defendant knew or should have known its methods of accepting and storing Plaintiff's and the Class Members' Private Information was inadequate as it relates to, at the very least, securing servers and other equipment containing Plaintiff's and the Class Members' Private Information.

182.     As a direct and proximate result of Defendant's breach of its confidence with Plaintiff and the Class Members, Plaintiff and the Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to decide how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk of exposure to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information of current and former patients; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and the Class Members.

183.     As a direct and proximate result of Defendant's breaches of confidence, Plaintiff and the Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## **PRAYER FOR RELIEF**

A.      That the Court certify this action as a class action and certify the Class as proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff are proper class representatives; and appoint Plaintiff's Counsel as Class counsel;

B.      That the Court grant permanent injunctive relief to prohibit Defendant from engaging in the unlawful acts, omissions, and practices described herein;

C.      That the Court award Plaintiff and members of the Class compensatory, consequential, and general damages in an amount to be determined at trial;

D.      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of its unlawful acts, omissions, and practices;

E.      That the Court award statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

F.      That Plaintiff be granted the declaratory relief sought herein;

G.      That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

H.      That the Court award pre- and post-judgment interest at the maximum legal rate; and

I.      That the Court grant all such other relief as it deems just and proper.


Dated: July 25, 2023                    Respectfully submitted,



**KARON LLC**

*s/Daniel R. Karon*
Daniel R. Karon (0069304)
700 W. St. Clair Ave. Suite 200
Cleveland, OH 44113
Telephone: (216) 622-1851
dkaron@karonllc.com

**BERMAN TABACCO**
Patrick T. Egan (BBO #637477)
Nathaniel L. Orenstein (BBO #664513)
Christina L. Gregg (BBO #709220)
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
pegan@bermantabacco.com
norenstein@bermantabacco.com
cgregg@bermantabacco.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2023 a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*s/Daniel R. Karon*
Daniel R. Karon